******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

WEBSTER BANK, N.A. *v.* BRIAN
J. FRASCA ET AL.
(AC 40307)

Alvord, Keller and Bishop, Js.

*Syllabus*

The plaintiff bank sought to foreclose a mortgage on certain real property
owned by the defendants F and B. After the trial court rendered a
judgment of strict foreclosure, the law day passed and the defendants
did not redeem. Thereafter, the plaintiff filed a motion for a deficiency
judgment, which the trial court denied due to the plaintiff's failure to
establish the fair market value of the property by credible and accurate
evidence. On appeal to this court, the plaintiff claimed that the trial
court committed plain error, demonstrated judicial bias and abused its
discretion. *Held*:

1. The trial court did not commit plain error when it failed to consider
certain property valuations in the plaintiff's appraisal report submitted
at the deficiency judgment hearing; for the plaintiff to obtain a deficiency
judgment, it had the burden of proving that the property had a fair
market value that was less than the amount of the debt on the date title
vested and, thus, had the burden of presenting sufficient evidence for
the court to determine the value of the property on that date, the trial
court, as the fact finder, found that the plaintiff's appraisal report was
unreliable, and the plaintiff did not demonstrate that the claimed error
was both so clear and harmful that a failure to reverse the judgment
would result in manifest injustice, nor was the court's alleged error of
such a monumental proportion that it threatened to erode our system
of justice.

2. The trial court did not commit plain error when it imposed a preponder-
ance of the evidence standard of proof under statute (§ 49-14); although
the plaintiff argued that the court should have used the probable cause
standard of proof to establish the fair market value of the property, it
did not demonstrate that the standard used by the court constituted
plain error, as the trial court's thorough decision included a detailed
discussion and analysis in support of its finding that the appraisal con-
tained significant errors and lacked credibility, and there was no support
for the notion that a trial court should employ a lesser burden of proof
than the fair preponderance standard in a deficiency judgment hearing.

3. The trial court did not commit plain error when it made certain comments
on the record during the deficiency judgment hearing: although some
of the court's comments went beyond the scope of the issues and were
unhelpful and a distraction, they did not demonstrate hostility toward
the plaintiff and were not a manifestation of bias, as none of the plaintiff's
allegations could reasonably be tied to the court's finding that it failed
to meet its burden of proof as to the value of the property, and the
analysis in the court's memorandum of decision was thorough, well
reasoned and based on valid legal principles reasonably applied to the
admissible and credible evidence presented; moreover, although the
trial court made remarks throughout the hearing referencing knowledge
derived from extrajudicial sources, such references were not relied on
by the court in its analytical decision-making process in denying the
plaintiff's motion for a deficiency judgment, and the plaintiff did not
demonstrate that it suffered manifest injustice such that would consti-
tute plain error requiring reversal.

4. The plaintiff could not prevail on its claim that the trial court abused its
discretion when it admitted and relied on certain evidence submitted
during the hearing: although a trial court is not permitted to rely on
irrelevant evidence to determine the fair market value of a subject
property, the court was not required to make a fair market value determi-
nation if it did not find the evidence presented credible or reliable, F
presented ample evidence for the court to determine that the plaintiff
failed to satisfy its burden of demonstrating the fair market value of
the property as of the date title vested in the plaintiff, and, thus, the
court did not abuse its discretion in utilizing, referencing or examining

certain appraisal reports to weigh against the opinion of the plaintiff's expert; moreover, because it was the plaintiff's burden to demonstrate the fair market value of the subject property, the court's decision to find no credible valuation on the basis of the plaintiff's failure to meet that burden was within the reasonable bounds of its discretion.

5. The trial court did not abuse its discretion when it denied the plaintiff's motion for a protective order in response to F's notice of deposition, the plaintiff having failed to explain how the denial of its motion caused harm and how F's notice of deposition adversely affected the underlying proceeding on the motion for a deficiency judgment.

Argued February 20—officially released July 10, 2018

*Procedural History*

Action to foreclose a mortgage on certain real property owned by the defendants, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the court, *Mintz, J.*, granted the plaintiff's motion to cite in Allison D. Brant as a party defendant; thereafter, the court, *Mintz, J.*, granted the plaintiff's motion for summary judgment as to liability only; subsequently, the court, *Mintz, J.*, granted the plaintiff's second motion for summary judgment as to liability only; thereafter, the court, *Mintz, J.*, granted the plaintiff's motion for a judgment of strict foreclosure and rendered judgment thereon; subsequently, the court, *Hon. Kevin Tierney*, judge trial referee, denied the plaintiff's motion for a protective order; thereafter, the court, *Hon. Kevin Tierney*, judge trial referee, granted the plaintiff's motion to reargue and for reconsideration, but denied the relief requested therein; subsequently, the court, *Hon. Kevin Tierney*, judge trial referee, denied the plaintiff's motion for a deficiency judgment, and the plaintiff appealed to this court. *Affirmed.*

*Andrew P. Barsom*, for the appellant (plaintiff).

*Maryam Afif*, with whom, on the brief, was *Seth J. Arnowitz*, for the appellee (named defendant).

*Opinion*

BISHOP, J. The plaintiff, Webster Bank, N.A., appeals from the trial court's denial of its motion for a deficiency judgment following a judgment of strict foreclosure against the defendants Brian J. Frasca and Allison D. Brant.[1] On appeal, the plaintiff asserts three claims: (1) the court committed plain error by (a) failing to consider two valuations of the property found in the appraisal report of the plaintiff's expert witness, (b) imposing an incorrect burden of proof under General Statutes § 49-14,[2] and (c) making comments during the hearing that demonstrated judicial bias; (2) the court abused its discretion by erroneously relying on various exhibits submitted during the deficiency judgment hearing; and (3) the court abused its discretion by denying the plaintiff's motion for a protective order in response to the defendant's notice of deposition. We affirm the judgment of the trial court.

The following facts and procedural history, as set forth in the court's memorandum of decision, are relevant to our consideration of this appeal. "[The property, 83 East Middle Patent Road, Greenwich (property)] is two acres of residential zoned property improved with a single family house built in 1750. The two acres are located within the boundaries . . . of Stamford . . . but for reasons not fully explained at the hearing, [the property] is entitled to receive a Greenwich . . . address. Apparently, a number of properties located on East Middle Patent Road share that same distinction, being Stamford . . . real property with deeds and documents recorded in the Stamford land records, but possessing a Greenwich . . . address. The two defendants, then husband and wife . . . executed an adjustable rate note to [the plaintiff] for $1,252,000 on January 19, 2006. That note was secured by a first mortgage on [the property] recorded on the Stamford land records in volume 8410 at page 239. A loan modification agreement dated February 24, 2011, was executed in which it was agreed as of March 1, 2011, that the principal balance due was $1,270,156.98. . . .

"This current foreclosure action was returnable to the Superior Court, judicial district of Stamford-Norwalk at Stamford on October 7, 2014. The operative complaint was the May 14, 2015 amended complaint, which alleged nonpayment of the installment payments due on or about March 1, 2014. . . .

"The plaintiff's May 7, 2015 motion for summary judgment as to the defendant was granted by the court, *Mintz, J.*, on July 13, 2015. The plaintiff's July 22, 2015 motion for summary judgment as to [Brant] was granted by the court . . . on August 31, 2015. The plaintiff's March 30, 2015 motion for judgment of strict foreclosure was granted by the court . . . on October 19, 2015. . . . On October 19, 2015, a judgment of strict foreclo-

sure entered with a law day of December 8, 2015. The law day of December 8, 2015, passed. No appeal to the Appellate Court was filed. No stay of the judgment entered. No motion to open the judgment was filed. The defendants failed to redeem by their law day. Title [of the property] therefore passed to the plaintiff . . . .

"Immediately thereafter the plaintiff's instant motion for [a] deficiency judgment was filed on December 11, 2015. The motion was assigned to this court and the court conducted two days of evidentiary hearings on October 26, 2016 and March 1, 2017. At the conclusion of evidence each of the three parties represented by counsel furnished oral argument. Posthearing briefs were waived."

On April 4, 2017, the court, *Hon. Kevin Tierney*, judge trial referee, denied the plaintiff's motion for a deficiency judgment "because of the plaintiff's failure to establish the fair market value [of the property] by credible and accurate evidence . . . ." This appeal followed. Additional facts will be set forth as necessary.

I

On appeal, the plaintiff raises three unpreserved claims for which it seeks plain error review. First, the plaintiff contends that the court committed plain error by failing to consider two valuations of the property contained in its appraisal report. Second, the plaintiff argues that the court should not have imposed a preponderance of the evidence standard but, rather, should have used a probable cause standard in determining the plaintiff's burden of proof. Third, the plaintiff claims that comments made by the court about the plaintiff's motive for seeking a deficiency judgment and about Brant's family during the hearings reveal judicial bias.

It is well established that "[the plain error] doctrine, codified at Practice Book § 60-5, is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . Implicit in this very demanding standard is the notion . . . that invocation of the plain

error doctrine is reserved for occasions requiring the reversal of the judgment under review. . . .

"An appellate court addressing a claim of plain error first must determine if the error is indeed plain in the sense that it is patent [or] readily discernible on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . This determination clearly requires a review of the plain error claim presented in light of the record.

"Although a complete record and an obvious error are prerequisites for plain error review, they are not, of themselves, sufficient for its application. . . . [I]n addition to examining the patent nature of the error, the reviewing court must examine that error for the grievousness of its consequences in order to determine whether reversal under the plain error doctrine is appropriate. A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice. . . . In *State* v. *Fagan*, [280 Conn. 69, 87, 905 A.2d 1101 (2006), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007)], we described the two-pronged nature of the plain error doctrine: [An appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is *both* so clear *and* so harmful that a failure to reverse the judgment would result in manifest injustice." (Emphasis in original; internal quotation marks omitted.) *Reville* v. *Reville*, 312 Conn. 428, 467–69, 93 A.3d 1076 (2014). With these principles in mind, we address each of the plaintiff's claims of plain error in turn.

A

The plaintiff's first plain error claim is that the court failed, incorrectly, to consider "additional statements of value" contained in its appraisal report submitted at the hearing for a deficiency judgment. In support of this argument, the plaintiff contends that § 49-14 "does not require demonstration of the fair market value of the property as of the date of vesting with absolute scientific certainty, but rather imposes a burden on the moving party to supply sufficient facts to permit the court to make its independent determination of value as mandated by statute." The plaintiff asserts that the alternative approaches to valuation set forth in the appraisal report it submitted in support of its motion supplemented its final statement of value and, in combination, the statements of value contained in the appraisal report amply satisfied its burden of proof at the deficiency hearing. In response, the defendant argues that because the court found the appraisal report not credible, there was "no reason for the court to consider any of the valuations allegedly contained therein." We agree with the defendant.

The following additional information is pertinent to

this claim. The record reveals that the plaintiff sought a deficiency judgment against the defendants because at the time of the strict foreclosure judgment, the property was appraised at $750,000 and the plaintiff's debt was $1,425,498.13. As evidence of the property's value at the hearing on the motion for a deficiency judgment, the plaintiff submitted an appraisal from its expert witness, Allen Glucksman, a residential real estate appraiser. Glucksman conducted an appraisal of the property on December 23, 2015 (December, 2015 report), and concluded that the fair market value of the property was $725,000. The plaintiff's claim regarding "three separate and distinct statements of value" contained in the December, 2015 report refers to the appraiser's discussion of the sales comparison approach, which resulted in a valuation of the property at $725,000; the cost approach, which yielded a value of $846,421; and in the appendix to the appraisal report, a property field card which lists a 2014 appraisal value of $894,144. Glucksman's affidavit, also attached to the appraisal report, stated, "[i]t is my professional opinion to a reasonable degree of certainty that the value of the subject property in its present condition is $725,000." Glucksman testified that he could not complete the cost approach. There was no testimony regarding the 2014 property field card valuation.

The defendants did not submit their own appraisal of the property. Rather, they presented their own expert witness, Taylor Beerbower, another residential real estate appraiser, who examined and gave testimony regarding Glucksman's December, 2015 report. Beerbower asserted that the report contained significant errors making it "unreliable and inconclusive" and confirmed that it did not provide enough evidence for the court to establish the value of the property. Beerbower noted, inter alia, that the appraisal report did not include any other antique homes as comparables, included a short sale home as a comparable, contained significant errors in the square footage calculations of some of the comparables, and overall lacked discussion in the body of the report explaining how Glucksman arrived at his appraisal value. In its decision, the court noted many of the same errors in the December, 2015 report that Beerbower highlighted in his testimony.[3] It concluded that the plaintiff failed to establish the fair market value by credible and accurate evidence.

This court previously has stated that "[a] deficiency proceeding has a very limited purpose. . . . [T]he court, after hearing the party's appraisers, determines the value of the property and calculates any deficiency. This deficiency judgment procedure presumes the amount of the debt as established by the foreclosure judgment and merely provides for a hearing on the value of the property. . . . The deficiency hearing concerns the fair market value of the subject property as of the date title vests in the foreclosing plaintiff under [Gen-

eral Statutes] § 49-14. . . . [T]he value placed on the property by the court for the purposes of rendering judgment of strict foreclosure and setting law days [is] irrelevant to a subsequent deficiency judgment proceeding. . . .

"[I]mplicit in . . . § 49-14 is the requirement that the party seeking a deficiency judgment satisfy her burden of proof regarding the fair market value of the property . . . in particular, the requirement that the plaintiff provide the court with sufficient evidence to demonstrate that she is entitled to a deficiency judgment. . . . When considering a motion for a deficiency judgment, the trial court may make an independent determination as to the valuation of the property. . . . Our Supreme Court has held that, in a deficiency judgment proceeding, [t]he determination of [a property's] value by a court is the expression of the court's opinion aided ordinarily by the opinions of expert witnesses, and reached by weighing those opinions in light of all the circumstances in evidence bearing upon value and its own general knowledge of the elements going to establish it. . . . [T]he determination of the credibility of expert witnesses and the weight to be accorded their testimony is within the province of the trier of facts, who is privileged to adopt whatever testimony he reasonably believes to be credible. . . .

"In determining valuation pursuant to . . . § 49-14, the trier, as in other areas of the law, is not bound by the opinion of the expert witnesses . . . . The evaluation of testimony is the sole province of the trier of fact. We do not retry the case. The conclusion of the trial court must stand unless there was an error of law or a legal or logical inconsistency with the facts found. . . . We will disturb the trial court's determination of valuation, therefore, only when it appears on the record before us that the court misapplied or overlooked, or gave a wrong or improper effect to, any test or consideration which it was [its] duty to regard." (Citations omitted; internal quotation marks omitted.) *Brownstein* v. *Spilke*, 117 Conn. App. 761, 765–67, 982 A.2d 198 (2009), cert. denied, 294 Conn. 927, 986 A.2d 1053 (2010).

In order for the plaintiff to succeed in its quest for a deficiency judgment, it was required to prove that the property had a fair market value that was less than the amount of the debt on the date of the vesting of title. To accomplish this goal, the plaintiff had the burden of presenting sufficient evidence for the court to determine the value of the property on that date. See *Eichman* v. *J & J Building Co.*, 216 Conn. 443, 451, 582 A.2d 182 (1990).

"When confronted with conflicting evidence as to valuation the trier may properly conclude that under all the circumstances a compromise figure most accurately reflects fair market value. . . . While we have held that the trial court *may* set the property value at a compro-

mise figure when confronted with conflicting expert testimony as to valuation . . . we have never held that the court *must* do so in the absence of any credible evidence." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 452. We reiterate that "[i]t is within the province of the trial court, when sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence." (Internal quotation marks omitted.) *DuBaldo Electric, LLC* v. *Montagno Construction, Inc.*, 119 Conn. App. 423, 444, 988 A.2d 351 (2010).

The plaintiff claims that the court "considered only one of the three separate and distinct statements of value set forth in [the December, 2015 report]" and "failed to take into account all the circumstances in evidence bearing upon value as required and completely disregarded the obligation to use its own general knowledge to make an independent determination of the value of the property . . . ." (Internal quotation marks omitted.) In sum, the plaintiff argues that the court committed plain error because it discussed only the $725,000 appraisal value in its decision, and did not reference the other two statements of value that were "unchallenged" and "factually sufficient" listed in the December, 2015 report. In making this argument, however, the plaintiff fails to acknowledge the court's finding that the plaintiff's appraisal report was unreliable; nor has the plaintiff demonstrated that "the claimed error is *both* so clear *and* so harmful that a failure to reverse the judgment would result in manifest injustice." (Emphasis in original; internal quotation marks omitted.) *Reville* v. *Reville*, supra, 312 Conn. 468–69. Finally, we cannot conclude that the court's alleged error was of such a monumental proportion that it threatened to erode our system of justice, based on the court's role as the trier of fact. Under § 49-14, the court "is privileged to adopt whatever testimony [it] reasonably believes to be credible;" (internal quotation marks omitted) *Brownstein* v. *Spilke*, supra, 117 Conn. App. 766; and in this case, it found the plaintiff's evidence not to be sufficiently credible. Accordingly, we conclude that the plaintiff has failed to demonstrate that the court committed plain error in not relying on the alternative values set forth in Glucksman's appraisal report.

B

The plaintiff additionally claims that the court committed plain error by imposing an erroneous burden of proof under § 49-14. In its decision, the court stated, "[t]his court finds that the plaintiff has failed to establish by sufficient credible evidence to satisfy the plaintiff's burden of proof by a fair preponderance of the evidence as to what the fair market value is of [the property] . . . ." On appeal, the plaintiff submits that trial courts should employ a probable cause standard as the burden of proof during deficiency judgment hearings. We are

unpersuaded.

We first reiterate that implicit in a deficiency hearing under § 49-14 "is the requirement that the party seeking a deficiency judgment satisfy her burden of proof regarding the fair market value of the property . . . in particular, the requirement that the plaintiff provide the court with sufficient evidence to demonstrate that she is entitled to a deficiency judgment. . . . When considering a motion for a deficiency judgment, the trial court may make an independent determination as to the valuation of the property." (Emphasis omitted; internal quotation marks omitted.) *Banco Popular North America* v. *du'Glace, LLC*, 146 Conn. App. 651, 656, 79 A.3d 123 (2013).

Although the plaintiff argues that the court should have used a lesser standard of proof to establish the fair market value of the property, it has not demonstrated that the standard employed by the court constituted plain error. Additionally, the court's thorough decision includes a detailed discussion and analysis in support of its finding that Glucksman's appraisal contained significant errors and, accordingly, lacked credibility. See footnote 3 of this opinion. Also, we are aware of no decisional support for the notion that a trial court should employ a lesser burden of proof than the fair preponderance standard in a deficiency judgment hearing. To the contrary, this court previously has affirmed a denial of a motion for a deficiency judgment when the trial court applied a fair preponderance of the evidence standard and concluded that the plaintiff's expert witness was not credible. See *Farmers & Mechanics Savings Bank* v. *Durham Realty, Inc.*, 34 Conn. App. 204, 206, 640 A.2d 1017 (1994) ("[t]he movant has failed to satisfy its burden of proof by establishing by a fair preponderance of the evidence the reasonable market value of the premises as of the date of the transfer of title to it" [emphasis omitted; internal quotation marks omitted]).

We reiterate that the plain error doctrine should be invoked sparingly and "reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *Reville* v. *Reville*, supra, 312 Conn. 468. The error also must be plain in the sense that is patent or readily discernible, and obvious in the sense of not debatable. Id. In the present case, this particular argument advanced by the plaintiff, that this court should adopt a diminished standard of proof for deficiency judgment hearings, fails because the standard of proof employed by the court was not plain error. Indeed, it was not erroneous at all.

C

Next, the plaintiff claims that the court committed

plain error because its comments during the hearings and in its memorandum of decision reflected a judicial bias against the plaintiff. The plaintiff asserts that the court's commentary throughout the proceedings suggests that the court attributed "an ulterior motive to [the] plaintiff in pursuing the deficiency judgment to reach the assets of, or collection of, the proposed deficiency balance due from nonparty family members of [Brant]." The plaintiff claims, as well, that the court's comments during the hearing, specifically regarding the defendant's former father-in-law, reflected bias because he was not a party to the action. In sum, the plaintiff asserts that "the statements of the court attributing an ulterior motive to [the] plaintiff's exercise of its statutory rights and its statements within the memorandum of decision regarding the family of . . . Brant give rise to the appearance of a lack of impartiality and bias to a reasonable observer which requires reversal of the court's decision as plain error."

Before our discussion of the plaintiff's particular claims, we review, briefly, the issue of judicial bias. "[T]he floor established by the Due Process Clause clearly requires a fair trial in a fair tribunal . . . before a judge with no actual bias against the defendant or interest in the outcome of [a] particular case." (Citation omitted; internal quotation marks omitted.) *Bracy* v. *Gramley*, 520 U.S. 899, 904–905, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997). "[O]ur Supreme Court has recognized that a claim of judicial bias strikes at the very core of judicial integrity and tends to undermine public confidence in the established judiciary. . . . No more elementary statement concerning the judiciary can be made than that the conduct of the trial judge must be characterized by the highest degree of impartiality. If [the judge] departs from the standard, he [or she] casts serious reflection upon the system of which [the judge] is a part. . . . We review this [unpreserved] claim [of partiality] therefore . . . under a plain error standard of review." (Internal quotation marks omitted.) *Schimenti* v. *Schimenti*, 181 Conn. App. 385, 394, A.3d (2018).

"We use an objective rather than a subjective standard in deciding whether there has been a violation of canon 3 (c) (1) [of the Code of Judicial Conduct]. Any conduct that would lead a reasonable [person] knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned is a basis for the judge's disqualification. Thus, an impropriety or the appearance of impropriety . . . that would reasonably lead one to question the judge's impartiality in a given proceeding clearly falls within the scope of the general standard. . . . The question is not whether the judge is impartial in fact. It is simply whether another, not knowing whether or not the judge is actually impartial, might reasonably question his . . . impartiality, on the basis of all of the circumstances. . . . Even in the

absence of actual bias, a judge must disqualify himself in any proceeding in which his impartiality might reasonably be questioned, because the appearance and the existence of impartiality are both essential elements of a fair exercise of judicial authority." (Citations omitted; internal quotation marks omitted.) *Burton* v. *Mottolese*, 267 Conn. 1, 30, 835 A.2d 998 (2003), cert. denied, 541 U.S. 1073, 124 S. Ct. 2422, 158 L. Ed. 2d 983 (2004).

"In assessing a claim of judicial bias, we are mindful that adverse rulings, alone, provide an insufficient basis for finding bias even when those rulings may be erroneous. . . . [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Schimenti* v. *Schimenti*, supra, 181 Conn. App. 395. It is through the lens of this jurisprudence that we view the plaintiff's claims of judicial bias.

We first address the plaintiff's assertion that the court displayed bias against it by suggesting that the plaintiff had an ulterior motive in bringing this action, which was to obtain satisfaction of its debt from Peter Brant, the defendant's former father-in-law. In support of this claim, the plaintiff cites to five pages of transcript from the October 26, 2016 hearing, which, the plaintiff claims, reveal the court's impropriety in this regard. The transcript reflects that before hearing any testimony on this date, the court asked counsel whether any efforts had been made to resolve the matter and, in that context, repeatedly referred to Peter Brant, a person of substantial financial means.[4]

We agree that the court's comments regarding the practical issue of whether the plaintiff could actually obtain satisfaction of any deficiency judgment from either of the named defendants are of concern because they were beyond the scope of the issues for the court's decision. We do not read these comments, however, as a demonstration of hostility toward the plaintiff's claim for a deficiency judgment. Instead, although we agree with the plaintiff that the court's many references to Peter Brant were unhelpful and a distraction, we do not view that as a manifestation of bias, but rather find that they were a reflection of the court's views of the economic realities of the plaintiff's chances of col-

lection.

As additional support for its claim of judicial bias, the plaintiff asserts that in the March 1, 2017 hearing, the court made bias-infused comments regarding whether the court could credit any payments made on the mortgage, after the debt was determined at foreclosure, against the deficiency. One reasonable reading of the transcript reveals, however, that the court was posing a hypothetical situation and not positing that any such payments had, in fact, been made.[5] In their briefs, both parties ultimately agreed that the court had created a "fictitious scenario" during this colloquy; therefore, it is in this context that we assess the colloquy between the court and the plaintiff's counsel. We first turn to the court's comments regarding a hypothetical scenario in response to an assertion made by the plaintiff's counsel that *TD Bank, N.A.* v. *Doran*, 162 Conn. App. 460, 131 A.3d 288 (2016), stands for the principle "that the underlying finding of the judgment debt in the judgment of strict foreclosure is conclusive on the court's determination of the amount of the debt in a deficiency proceeding in that same action."[6] In reply, the court challenged counsel's reliance on *TD Bank, N.A.*, and posited that it could consider any evidence of payment made by the borrower, after strict foreclosure, toward the mortgage debt.[7] In sum, we understand from this exchange that the court was challenging counsel's reading of the *TD Bank, N.A.* decision and positing, instead, under the scenario it outlined, that the court could credit against the deficiency any payments made to the plaintiff by a member of Brant's family, after the judgment of strict foreclosure, but prior to the deficiency hearing, in order to calculate the remaining balance owed on the mortgage debt.[8] Because there was no such evidence adduced at the hearing, it is reasonable to conclude that the court, in this exchange, was testing the contours of the *TD Bank, N.A.* decision as an exercise and not positing that payments toward the debt had actually been made.

Allied to the plaintiff's claim that the court wrongly attributed an ulterior motive to it for seeking a deficiency judgment against the defendants is the claim that the court improperly made reference to its own personal knowledge of the area in which the subject property is located and to the Brant family which the court stated owns real estate nearby. In its principal brief, the plaintiff states that "[t]he transcript of the hearing clearly reflects that the court has vast personal knowledge of the area in which the property is located as well as the surrounding area and market conditions. The court, instead of employing its obvious knowledge to make a determination of value of the property as required under [§] 49-14, appears to have elected to attribute an ulterior motive to [the] plaintiff's pursuit of a statutory right to seek a deficiency judgment due to its own knowledge of the property holdings and

finances of [Brant's] family." As claimed by the plaintiff, the court's knowledge of the area is reflected in its memorandum of decision in which the court stated: "This property is immediately adjacent to real property owned by the family of [Brant], and in this court's opinion would be a natural acquisition by the Brant family of this additional two acres."[9] Although we agree that reference to an adjacent property not owned by either defendant was unnecessary to the court's decision, we do not read in this reference a bias against the plaintiff's quest for a deficiency judgment. Indeed, it amply reveals that the court had familiarity with the area and with Brant's family and that the court, albeit distractingly, shared this information with the parties during the hearing.[10] It should be noted, as well, that during the hearing, the plaintiff's counsel may have in fact perceived the court's knowledge of the area in which the property is located as a benefit to the parties. In his closing argument, the plaintiff's counsel stated in regard to the court's familiarity with the property: "That's why . . . Your Honor, with your background and understanding of this particular market, was assigned this case. I think it's a benefit to all parties to have had Your Honor assigned."

In response to the plaintiff's claims of judicial bias, the defendant contends that none of the plaintiff's allegations of bias can reasonably be tied to the court's finding that the plaintiff failed to meet its burden of proof as to the value of the property. We agree. Although the court's comments regarding the Brant family and the expression of the court's knowledge of the area and property in question should not have been stated, we do not find bias in the court's many asides and digressions. In sum, a review of the hearing transcripts reveals that throughout the proceedings, the court often made lengthy anecdotal comments, engaged in tangential musings, and pondered detailed hypotheticals not relevant to the issues at hand.[11] Additionally, although, as noted, the court also made several comments reflecting a knowledge of the parties' immediate family which were not pertinent to the issue confronting the court, we do not believe that the court's multiple, unhelpful interjections reflected a hostility toward the plaintiff's claims or against the plaintiff itself. Thus, although the transcripts of the proceedings reveal that the court offered extended asides on matters not at issue, the analysis in its memorandum of decision was thorough, well reasoned, and based on valid legal principles reasonably applied to the admissible and credible evidence presented before it. See footnote 3 of this opinion. Although we recognize that throughout the hearing the court made remarks referencing knowledge derived from extrajudicial sources, which *may* support a claim of judicial bias; *Schimenti* v. *Schimenti*, supra, 181 Conn. App. 395; such references were not relied upon by the court in its analytical decision-making process in

denying the plaintiff's motion for a deficiency judgment. Although the court repeatedly made unnecessary and/or unhelpful comments throughout the hearing, the plaintiff has not demonstrated that it suffered manifest injustice such that would constitute plain error requiring reversal.

## II

The plaintiff next claims that the court abused its discretion by "improperly admitting and relying on irrelevant evidence; drawing improper inferences of current value from the original loan amount; and failing to consider the uncontroverted evidence of value presented during the hearing." Because all the claims are reviewed under an abuse of discretion standard, we discuss them collectively.

"[A] trial court in foreclosure proceedings has discretion, on equitable considerations and principles, to withhold foreclosure or to reduce the amount of the stated indebtedness. . . . A request for a deficiency judgment is part of a foreclosure action. . . . We review mortgage foreclosure appeals under the abuse of discretion standard. . . . The determination of what equity requires is a matter for the discretion of the trial court. . . . In determining whether the trial court has abused its discretion, we must make every reasonable presumption in favor of the correctness of its action. . . . Our review of a trial court's exercise of the legal discretion vested in it is limited to the questions of whether the trial court correctly applied the law and could reasonably have reached the conclusion that it did." (Citations omitted; internal quotation marks omitted.) *MTGLQ Investors, L.P.* v. *Egziabher*, 134 Conn. App. 621, 623–24, 39 A.3d 796 (2012).

The plaintiff first asserts that the court abused its discretion by admitting into evidence a January 11, 2006 appraisal report of the property (January, 2006 report) and then referencing the report in its memorandum of decision. The defendant testified that the plaintiff ordered the January, 2006 report, which appraised the property to have a fair market value of $1,565,000 on January 9, 2006. The plaintiff argues that the January, 2006 report is irrelevant because it "had absolutely no legal, logical, or factual relationship to the value of the property as of December 11, 2015 . . . ."

As support, the plaintiff relies on *First Federal Bank, FSB* v. *Gallup*, 51 Conn. App. 39, 42–44, 719 A.2d 923 (1998), for the proposition that a deficiency hearing under § 49-14 concerns the fair market value of the subject property as of the date title vests in the foreclosing plaintiff. The value of the property at any other time is irrelevant. See id., 42. In this setting, the plaintiff's reliance on *Gallup* is misplaced. In *Gallup*, unlike the situation at hand, the trial court relied on a two year old appraisal in its valuation of the subject property.

In the present case, the court wrote that it was "merely using the [January, 2006] appraisal for two points; the dichotomy between the large value in 2006 with the change to a 54 [percent] lesser value according to [Glucksman's] [December, 2015 report] and the failure of [Glucksman] to utilize Greenwich properties for comparables."[12] The court therefore did not utilize the January, 2006 report to determine the current fair market value of the property; rather, the court made reference to the January, 2006 report as further reason to find Glucksman's appraisal an unreliable indicator of the fair market value of the property.

Second, the plaintiff asserts that the court abused its discretion by improperly considering the defendants' original loan amount. Specifically, it asserts that "the court impermissibly relied on and drew inferences from the original [loan] amount . . . to determine the value of the property at the time of title vesting." In its decision, the court wrote: "Of overarching consideration was the fact that [the defendants'] loan had been furnished by the plaintiff . . . on January 19, 2006, in the amount of $1,252,000. Therefore, the fair market value of this real property as of January 19, 2006, had to have exceeded by some percentage of $1,252,000. . . . Yet it is that same entity, [the plaintiff], that is now claiming that the fair market value of the same real property is $725,000. That dichotomy demands that the appraisal opinion be examined with careful scrutiny."

The plaintiff's assertion, however, ignores the court's numerous recitals, based upon the evidence submitted during the hearing, for its conclusion that the December, 2015 report was not reliable. The court explained that it believed that the substantial errors and lack of explanation thereof, as highlighted by the defendant's expert witness, culminated in an unreliable appraisal. The court's decision does not reference the original loan amount beyond mentioning it as background information. Nor does the court rely on the original loan amount in its analysis or determine that the fair market value of the property was an amount based on the original loan amount. Accordingly, the court did not abuse its discretion in referencing the original loan amount.

Third, the plaintiff contends that the court improperly relied on appraisal reports of the property that Glucksman conducted in March, 2015 and September, 2015. The court's decision references the prior appraisal reports as a comparison to the December, 2015 report, notably highlighting discrepancies between the reports, even when the reports utilized some of the same comparable homes. Again, the court appears to have utilized the prior appraisal reports as part of its basis for determining that the plaintiff's evidence was not credible or accurate. The record does not support the plaintiff's claim that the court relied on the prior appraisal

reports to determine the present value of the property.

Fourth, the plaintiff claims that the court abused its discretion by "engaging in a hypertechnical analysis" of the comparables in the December, 2015 report and the prior appraisal reports, thereby failing to make a determination of value "based on the other sufficient evidence" presented. To further its argument, the plaintiff recites portions of the court's decision and statements made by the court during the hearings.

We reiterate that the determination of value "is the expression of the court's opinion aided ordinarily by the opinions of expert witnesses, and reached by weighing those opinions in light of all the circumstances in evidence bearing upon value and its own general knowledge of the elements going to establish it. . . . [T]he determination of the credibility of expert witnesses and the weight to be accorded their testimony is within the province of the trier of facts, who is privileged to adopt whatever testimony he reasonably believes to be credible." (Internal quotation marks omitted.) *Brownstein* v. *Spilke*, supra, 117 Conn. App. 766. Furthermore, when we review claims for an abuse of discretion, "the question is not whether any one of us, had we been sitting as the trial judge, would have exercised our discretion differently. . . . Rather, our inquiry is limited to whether the trial court's ruling was arbitrary or unreasonable." (Citation omitted; internal quotation marks omitted.) *State* v. *Cancel*, 275 Conn. 1, 18, 878 A.2d 1103 (2005).

We agree with the general principle that during a deficiency judgment hearing, a trial court is not permitted to rely on irrelevant evidence to determine the fair market value of the subject property. We also agree that a trial court is *not required* to make a fair market value determination if it does not find the evidence presented at the deficiency judgment hearing credible or reliable. Within this parameter, the defendant presented ample evidence for the court, in the exercise of its discretion, to determine that the plaintiff failed to satisfy its burden of demonstrating the fair market value of the property as of the date title vested in the plaintiff. Accordingly, we cannot conclude that the court abused its discretion in utilizing the prior appraisal reports, or examining the December, 2015 report in detail, to weigh against the opinion of the plaintiff's expert. Because ultimately it was the plaintiff's burden to demonstrate the fair market value of the subject property in a deficiency judgment, the court's decision to find no credible valuation on the basis of the plaintiff's failure to meet this burden was within the reasonable bounds of its discretion.

III

Lastly, the plaintiff claims that the court abused its discretion by denying the plaintiff's motion for a protec-

tive order in response to the defendant's notice of deposition. "Practice Book § 13-5 provides in relevant part: Upon motion by a party from whom discovery is sought, and for good cause shown, the judicial authority may make any order which justice requires to protect a party from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following . . . that the discovery may be had only on specified terms . . . ." (Internal quotation marks omitted.) *Coss* v. *Steward*, 126 Conn. App. 30, 46, 10 A.3d 539 (2011). "[T]he [trial] court's inherent authority to issue protective orders is embodied in Practice Book § 13-5 . . . . The use of protective orders and the extent of discovery is within the discretion of the trial judge. . . . We have long recognized that the granting or denial of a discovery request . . . is subject to reversal only if such an order constitutes an abuse of that discretion." (Citation omitted; internal quotation marks omitted.) Id. We reiterate that "[i]n determining whether the trial court has abused its discretion, we must make every reasonable presumption in favor of the correctness of its action." (Internal quotation marks omitted.) *MTGLQ Investors*, *L.P.* v. *Egziabher*, supra, 134 Conn. App. 624.

Nonetheless, the plaintiff fails to explain how the denial of its protective order caused harm, beyond the general assertion that the denial "impermissibly allowed the relitigation of issues that were irrelevant to the stance of the proceedings and had previously been disposed of by the judgment of strict foreclosure." The plaintiff fails to identify which issues were irrelevant and caused harm and, more importantly, fails to explain how the defendant's notice of deposition adversely affected the underlying proceeding on the motion for a deficiency judgment.[13] Accordingly, we cannot conclude that the court abused its discretion in denying the plaintiff's motion for a protective order. See *Coss* v. *Steward*, supra, 126 Conn. App. 47 (affirming court's granting of motion for protective order when plaintiffs failed to demonstrate how they were harmed by protective order).

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Frasca is the only defendant who filed a brief in this appeal. We refer to Frasca as the defendant, and to Frasca and Brant collectively as the defendants. The other named defendants in the underlying foreclosure action, People's United Bank and the city of Stamford, were not parties to the motion for a deficiency judgment.

[2] General Statutes § 49-14 (a) provides: "At any time within thirty days after the time limited for redemption has expired, any party to a mortgage foreclosure may file a motion seeking a deficiency judgment. Such motion shall be placed on the short calendar for an evidentiary hearing. Such hearing shall be held not less than fifteen days following the filing of the motion, except as the court may otherwise order. At such hearing the court shall hear the evidence, establish a valuation for the mortgaged property and shall render judgment for the plaintiff for the difference, if any, between such valuation and the plaintiff's claim. The plaintiff in any further action upon the debt, note or obligation, shall recover only the amount of such judgment."

[3] For example, the court noted that the December, 2015 report erroneously

stated that the property was served by public water and sewer, rather than a private well and septic system. Glucksman only was asked to conduct an external appraisal of the property, but it was vacant and available for interior inspection. Beerbower testified that internal inspections of antique houses are important. The record reflects that all four comparable properties utilized in the appraisal report were located in Stamford. Both Glucksman and Beerbower testified that property values in Greenwich would be different from those in Stamford.

[4] During the October 26, 2016 hearing, the following colloquy occurred before the start of evidence:

"The Court: Okay. All right. What was the face amount of the mortgage?

"[The Plaintiff's Counsel]: Your Honor, I believe it was $1,525,000.

"The Court: No, I don't think so.

"[The Plaintiff's Counsel]: $1,595,000, then.

"[The Defendant's Counsel]: No.

"[The Plaintiff's Counsel]: Your Honor, it was $1,252,000.

"The Court: Okay. Thank you. Okay. You've . . . spent some time trying to resolve this matter?

"[The Plaintiff's Counsel]: Your Honor, I—not from my perspective. I believe there had been—

"The Court: You're looking for Peter Brant in this room?

"[The Plaintiff's Counsel]: No, Your Honor, I'm not.

"The Court: Okay. You know he's not a party to the case?

"[The Plaintiff's Counsel]: I understand that.

"The Court: Brant Foundation is not a party to this case.

"[The Plaintiff's Counsel]: Correct.

"The Court: Correct. You surely couldn't be looking for money from [the defendant], could you?

"[The Plaintiff's Counsel]: Your Honor, my client's instructions are simply to proceed against both parties obligated on the note.

"The Court: Okay. Any reason to believe that [the defendant] has any money whatsoever?

"[The Plaintiff's Counsel]: Not personally, no.

"The Court: Deficiency judgment enters against [the defendant], he pulls the plug, and I'll see you in Bridgeport. Okay.

"[The Plaintiff's Counsel]: Understood.

"The Court: Yes. So why are we spending a lot of time if that's—if that's the case?

"[The Plaintiff's Counsel]: Your Honor, my—my client's belief is—and, again, subject to verifying with Your Honor the actual substance of the note itself—that there may be available avenues for collection of the deficiency balance.

"The Court: Okay. You have title to the property, correct?

"[The Plaintiff's Counsel]: Correct, Your Honor.

"The Court: And there was a claim that you served Allison Brant at the place of abode; that is [the property], correct?

"[The Plaintiff's Counsel]: Correct.

"The Court: And there was a claim that, in fact, that was not her abode at the time of the service, correct?

"[The Plaintiff's Counsel]: Correct.

"The Court: And therefore you joined her in it—in to be able to effect service on her, is that correct?

"[The Plaintiff's Counsel]: Correct, Your Honor.

"The Court: And did—were you able to effect service on her?

"[The Plaintiff's Counsel]: Yes.

"The Court: At her father's house, wasn't it?

"[The Plaintiff's Counsel]: I believe so.

"The Court: Yes. Okay. And do you know who she is employed by?

"[The Plaintiff's Counsel]: I do not.

"The Court: You don't?

"[The Plaintiff's Counsel]: I'm from up north, Your Honor.

"The Court: You don't—you really don't know that?

"[The Plaintiff's Counsel]: I really don't. I'm not from this area.

"[Brant's Counsel]: I'm not going to disclose it, Your Honor, but I think perhaps counsel can read between the lines.

"The Court: Would it surprise you that she may have been employed by an entity over which . . . Peter Brant, may have had some or some arguable control?

"[The Plaintiff's Counsel]: It wouldn't surprise me, no. I just don't know her exact employer, Your Honor.

"The Court: So if [Peter] Brant has control over her finances by reason of where she lives, and her finances by reason of where she is employed or has occupancy, how are you going to get any money from her?

"[The Plaintiff's Counsel]: Your Honor, my client—I understand the court's position. With respect to what happens should a deficiency judgment be entered, more likely than not the bank would undertake its own collection activities absent counsel. That's what I've seen happen in every case in which a deficiency is entered.

"The Court: I bet that if your client came into this court and had a file, a manila file with a folder on the outside, that the word Brant would be in large letters, red, bold, and a sticker would—saying this is Peter Brant's daughter, because everybody in Webster Bank would know who Peter Brant is.

"[The Plaintiff's Counsel]: My understanding is that they do, Your Honor.

"The Court: Yes, they do. Okay. And everybody in Webster Bank would know that when you're talking about Peter Brant that you're talking about nine digits. All right. You know what I'm talking about?

"[The Plaintiff's Counsel]: Yes, Your Honor.

"The Court: Okay. Isn't that coloring what your client is doing here?

"[The Plaintiff's Counsel]: Your Honor, to the extent that the bank knows it has no recourse whatsoever against Peter Brant or any party aside from those who signed that note, I don't think it bears any relevance.

"The Court: Okay. Isn't the bottom line of this case that—that there were three people who made a major mistake—[the defendant], [Brant], and [the plaintiff]—and they blew it on the value of the property. And the property is not worth a million-two or a million-five, as what they paid it. It was only worth half, and now you're trying to relitigate that mistake in this court. No body language, please.

"Unidentified Speaker: All right, sir.

"The Court: Okay."

Furthermore, our review of the record reveals that the defendant's objection to the motion for a deficiency judgment filed on February 1, 2016, and contained in the court's file, included information that may have informed the court's comments in this regard. In his objection to the motion for a deficiency judgment in which the defendant attempted to assert a defense of unconscionability, the defendant alleged: "The Webster Bank Residential Mortgage Exception Request provided by the plaintiff in its response to [the] defendant's first request for production has the following comments: [Allison] Brant's father, Peter Brant is a valued customer at Webster Bank. He has approximately [$]10 million in loans and approximately $579,000 on deposit. His net worth is approximately [$]500 million." (Internal quotation marks omitted.) In his objection, the defendant claimed, as well: "The plaintiff over-appraised the property at the time it was reviewing the defendant's loan application. The defendant was initially pursuing a loan with a different lender who would not approve the requested loan amount because the value of the property did not support such a high loan amount." Although the court did not reference the defendant's objection in its commentary, the existence of this objection in the file supports the idea that the court's knowledge of the background of the loan origination was not derived from extrajudicial sources.

[5] In raising this issue, it is apparent from the transcript that the court was aware that Brant had alleged, as a special defense, that the plaintiff failed to properly credit her for "all payments made and credits to be applied on the subject note." It is clear from the record that no evidence of any such payments was adduced at the hearing on the motion for a deficiency judgment. See footnote 8 of this opinion.

[6] In *TD Bank, N.A.* v. *Doran*, supra, 162 Conn. App. 468, this court concluded that special defenses, such as laches, that could have been raised during the foreclosure proceedings, may not be raised in the deficiency hearing. "The intent of the deficiency proceeding is to determine through a hearing the value of the property that has been foreclosed as of the date title vests in the mortgagee and to award the difference between that value and the amount of the debt as established by the foreclosure judgment. . . . Therefore, because [i]n a deficiency proceeding . . . the judgment of foreclosure has already determined that a debt is owed and the amount of that debt . . . [t]hose issues are not relitigated in the deficiency hearing." (Citation omitted; internal quotation marks omitted.) Id.

The following colloquy occurred after counsel's assertion:

"The Court: I cannot believe that that's what the case says, cannot believe. It doesn't make any sense.

"[The Plaintiff's Counsel]: Your Honor—

"The Court: That's ridiculous. It's ridiculous. [Brant's counsel] is ready to stand up and offer an expert from [the plaintiff], okay, and the evidence is going to show that a certain gentleman who happens to be related to [Brant's counsel's] client called up the [plaintiff] and asked them to open up and to have a special proceeding and open up on January 1, 2016, at which time that gentleman asked that his checking account balance be verified by the officer who'd opened up the bank on a legal holiday, and that gentleman asked that that part of that bank account be withdrawn for the purpose of applying it toward this loan. You're telling me that the Appellate Court says that that gentleman's efforts on January 1, 2016, to use all his influence with [the plaintiff] is for naught and should not be countenance by me. I should not allow the dastardly act of someone paying off a mortgage after the debt has been determined. I should not allow that.

"[The Plaintiff's Counsel]: Your Honor, that's what I'm telling you. While I can tell you factually as counsel, that never happened, but—

"The Court: Well, I'm telling you that there's going to be evidence to that effect, and you're telling me that that case prevents that evidence from coming in.

"[The Plaintiff's Counsel]: That is what I'm telling you, Your Honor.

"The Court: Well, I can't believe that that could be the situation."

[7] The colloquy during this debate reveals that the plaintiff's counsel considered, as parallel, the facts of the court's hypothetical scenario with the facts in *TD Bank*, *N.A.* v. *Doran*, supra, 162 Con App. 460. See footnote 6 of this opinion. For example:

"The Court: Was there any evidence at all that after the judgment entered in *that* case [*TD Bank*, *N.A.*] that there was a payment made by the—by the borrower?

"[The Plaintiff's Counsel]: I would welcome the defendants to put on that evidence.

"The Court: Well, you said that *that* case [*TD Bank*, *N.A.*] prevents that from being credited. That's what you've just argued.

"[The Plaintiff's Counsel]: I didn't know, Your Honor. I didn't say—

"The Court: Yes, you did. I went through the whole thing and you said, no, that had nothing to do with it. Judge Mintz's number is the number and that's the number that we use for the mathematical calculations regardless of the events that happened on January 1, 2016, in the closed offices of [the plaintiff] in which a certain gentleman who is known to [Brant's counsel] made a payment.

"[The Plaintiff's Counsel]: Your Honor, if they have evidence they wish to proceed about that, they can attempt to introduce it. I will likely object to it. Your Honor will rule on any such objections. But from our position, the judgment debt is what established the baseline for what we are seeking for a deficiency judgment." (Emphasis added.)

Subsequently, the plaintiff's counsel corrected his error:

"[The Plaintiff's Counsel]: Your Honor, I might have misspoken. Had there been such a payment, the bank would credit.

"The Court: I told you there was such a payment. They opened up the bank on January 1, 2016, and ordered that the money be swept from his checking account that he held at [the plaintiff].

"[The Plaintiff's Counsel]: Well, in that—

"The Court: The man has enough money in the checking account to pay off his whole mortgage. It's in his regular checking account.

"[The Plaintiff's Counsel]: I don't believe he has any obligation to do that however. Your Honor, if there had been any such payment, it would be credited."

[8] We note the hypothetical scenario posited by the court solely to put the plaintiff's argument of judicial bias in context. Whether any payment was made to decrease the debt after judgment by strict foreclosure was not an issue at the deficiency judgment hearing, not an issue raised on appeal, and not addressed by any party or the court as a purported occurrence in fact. See footnotes 6 and 7 of this opinion.

[9] The defendant testified that Brant's father "told me that he was going to give me the down payment towards a house. It wasn't that we got a down payment towards any house as our choosing. We got a down payment towards this house which he was in negotiations to purchase Lion Share Farm next door."

[10] For example, during the March 1, 2017 hearing, the following exchange occurred:

"The Court: Are you familiar with the zoning map of the town of

Greenwich?

"[The Defendant's Counsel]: I'm not intimately, Your Honor, no.

"The Court: You're not? Well I am. I've lived in town my whole life. It's a long, long way. This is in the four acre zone immediately adjacent. This is a two acre piece of property. The acreage immediately adjacent to it is a four acre zone and a four acre zone is some distance away. I don't know where Cat Rock Road is. I lived in three houses on Cognewaugh Road which is a similar street old Indian Road, and that is the back country of North Mianus. It's not quite the back country because its south of the parkway. But this is the zoning map and that shows where the four acre zones are. So if he wants to be critical, he needs to know what the zoning regulations are.

"I don't know the distance of how far it is and how far he's claiming. Roads wind around so it may very well be three miles by the way the road goes, but by the way the crow flies, it's not three miles to Cat Rock Road, but it's well over a mile before you even get to the first two acre zone in Greenwich. So if someone is trying to use a comparable for the two acres, that would be a reasonable thing to do to find it in the two acre zone. It would be a little hard to find [two] acres in a four acre—four acre zone.

"[The Defendant's Counsel]: That is true, Your Honor.

"The Court: It's possible to do that, but it will be [a] little hard to do it. It would be easier to find two acres that would be—and that area of Cat Rock Road would be primary to be looking for, but—okay.

"The Witness: Am I allowed to respond to that just where I got my—

"The Court: No, you may not. You may not.

"The Witness: Okay. Sorry.

"The Court: I'm just telling you that I have experience on it my own. How can I say that I don't know what's happening in Greenwich when he comes in and he says something about it when I've—the house that I was born in is right next to Cat Rock Road. I know the—I know the town rather well, okay.

"[The Defendant's Counsel]: Thank you, Your Honor. I will—

"The Court: I even played golf in Lion's Farms property.

"[The Defendant's Counsel]: I under—

"The Court: That's how far back it goes.

"[The Defendant's Counsel]: I understand it has a slope of some—

"The Court: A what?

"[The Defendant's Counsel]: A slope of some portion? It's rather large and slopes down? Is that—I haven't seen it in a long time.

"The Court: Yeah. I lost some golf balls there, all right.

"[The Defendant's Counsel]: Was is it a zone? Was it a course?

"The Court: Play on both sides. Played where [Peter] Brant's house is and that was part of the golf course, so I played on the golf course a number of times."

[11] For example, the court made lengthy commentary on various topics, including, but not limited to, counsel's use of the phrase "for the record" during his introductory identification; the court's personal schedule and availability; explanation and recitation of "enclaves" around the world; the court's previous real estate transactions in the Stamford/Greenwich area; the court's current work load; a lengthy discourse on e-filing, notices, and Practice Book § 10-13; the court's familiarity with the area around the property and Greenwich; and the court's caseload as a judge trial referee and his vacation schedule. The court's commentary can be fairly characterized as asides and nihil ad rem.

[12] During the March 1, 2017 hearing, the following exchange occurred between the defendant's counsel and Glucksman:

"Q. Okay. And when you chose comparable properties to do your [December, 2015] appraisal, you selected all properties that are located in Stamford; is that correct?

"A. Yes.

"Q. Now, is there a reason why you did not use any Greenwich properties in your comparisons?

"A. I'm trying to compare apples to apples.

"Q. And so you feel even though this has a Greenwich address, that it would not be a useful comparison?

"A. It would not."

[13] No evidence of the deposition was submitted during the deficiency judgment hearings. The record is unclear as to whether a deposition was actually conducted. On February 14, 2017, the defendant filed a motion for continuance, stating that the deposition was stayed and "cannot be rescheduled prior to [the] hearing date." That motion was denied on the

same day, with the court instructing that "[t]he deposition must be completed before the hearing . . . ." During the March 1, 2017 hearing, the court remarked: "I have heard nothing about any deposition completed or not completed. There's no motion. There's nothing to do with me. I don't have anything to do with that matter. That's between the two of you. I'm not asking for any status report as to any deposition or lack of deposition or anything of that nature because there's nothing before me. Nobody's raised any issue before me, okay?"

-----------------------------